UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,
                    Plaintiff,

                    -against-

TREVON BROWN,
CRAIG GRANT,
JOSHUA JEPPESEN,
RYAN MAASEN, and
MICHAEL NOBLE,
                    Defendants,

                    -and-

LAURA MASCOLA,
                    Relief Defendant.

21 Civ. 4791 (JGK)

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO THE COMMISSION'S REQUEST FOR MONETARY RELIEF AGAINST DEFENDANT CRAIG GRANT**

Richard G. Primoff
Gwen A. Licardo
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0148
Attorneys for Securities
and Exchange Commission

December 2, 2024

## TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ................................................................................................1

   I.    GRANT RECEIVED $1,748,417 IN COMMISSIONS FROM BITCONNECT IN EXCHANGE FOR PROMOTING BITCONNECT'S UNREGISTERED SECURITIES OFFERING ...................................................................................................................1

   II.   BITCONNECT INVESTORS SUSTAINED SUBSTANTIAL LOSSES ..........................4

   III.  THE FEDERAL TAX UNDERPAYMENT RATE ON $1,748,147 IS $702,105.84 THROUGH AUGUST 31, 2024, MUCH LESS THAN BITCOIN'S GROWTH IN PRICE DURING THE SAME PERIOD ...................................................................................6

PROPOSED CONCLUSIONS OF LAW ......................................................................................6

   I.    GRANT SHOULD PAY $1,748,147 IN DISGORGEMENT..............................................6

        A.  The Legal Standards Governing Disgorgement..........................................................6

        B.  The Commission Has Established the Predicate of Investor Pecuniary Harm ........7

        C.  Grant's Net Proceeds From His Unlawful Conduct Total $1,748,147......................8

   II.   GRANT SHOULD PAY $702,105.84 IN PREJUDGMENT INTEREST........................10

   III.  GRANT SHOULD PAY A CIVIL PENALTY OF $230,480...........................................11

CONCLUSION..............................................................................................................................14

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits the following Proposed Findings of Fact and Conclusions of Law, together with the December 2, 2024 Declaration of Richard G. Primoff (Dkt. No. 126, "Primoff Decl."), in support of its motion for default judgment against Defendant Craig Grant ("Grant"). Pursuant to the Court's Order dated November 6, 2024 (Dkt. No. 114, the "Order"), the Commission's proposed findings and conclusions only "concern[ ] all damages and any other monetary relief" the Commission seeks, Order at 1—not the injunctive relief the Commission also seeks, Dkt. No. 88 at ¶¶ 110-124.

## PROPOSED FINDINGS OF FACT[1]

**I.   GRANT RECEIVED $1,748,147 IN COMMISSIONS FROM BITCONNECT IN EXCHANGE FOR PROMOTING BITCONNECT'S UNREGISTERED SECURITIES OFFERING.**

1. From approximately January 2017 through January 16, 2018, BitConnect, an unincorporated organization, offered investors the opportunity to participate in its "lending program," which purportedly gave them the opportunity to earn daily "interest" payments by tendering bitcoin to BitConnect in exchange for BitConnect's digital tokens called the BitConnect Coin" ("BCC"), which investors would then "lend" to BitConnect in return for such "interest" payments (the "Lending Program"). ¶¶ 1, 3, 36, 41-59.

2. These investments in the Lending Program (1) were offered and sold as securities, (2) no registration statement has ever been filed with the Commission in connection with offers or sales of the Lending Program investments, and (3) no exemption from the requirements of the securities laws ever applied to these offers and sales. ¶¶ 1-5, 26-30, 41-67, 227-231.

3. To promote its unregistered securities offering, BitConnect paid promoters "referral" commissions and "development fund" commissions based on the amount of new

---

[1] "¶ __" without any cited document refers to the Complaint (Dkt. No. 1).

investments the promoters succeeded in obtaining for BitConnect through their promotions. ¶¶ 60-68, 75-76.

4.  From approximately April 2017 to January 2018, Grant, a regional BitConnect promoter, received referral and development fund commissions from BitConnect, based on the BitConnect investments he raised, in return for his promotion of BitConnect's unregistered securities offering, through videos he posted on YouTube and social media advertisements. ¶¶ 4-6, 18, 89-111.

5.  Grant has never been associated with any broker-dealer firm or registered with the Commission as a broker-dealer. ¶ 116.

6.  Yet Grant raised many millions of dollars for BitConnect through his promotional activities and directly recruited or indirectly recruited—meaning investors recruited by investors Grant had recruited, and then further recruited by those "downline" investors (¶¶ 62-64)—more than 4,000 investors for BitConnect. ¶¶ 101, 102, 112.

7.  Grant did not receive a fixed salary, hourly wage, or other compensation from BitConnect that was not tied to the amount of funds he raised from investors for BitConnect securities. ¶ 114.

8.  In investigative testimony he provided to the Commission before the Complaint's filing, Grant admitted that he received referral commissions and development fund commissions based on the dollar value of funds he raised from investors for BitConnect. *See* Tr. of July 9, 2019 Investigative Testimony of Craig Grant at 120:14-121:2, 123:18-124:19, 130:16-131:25,

attached as Ex. 1 to the Primoff Decl.[2]

9.  The Commission's expert, David Lam, took additional steps to identify the precise amount of net proceeds Grant received from BitConnect from April 2017 through January 2018. *See* Decl. of David Lam dated Sept. 4, 2024, Dkt. No. 89 ("Lam Decl."), ¶¶ 1, 4, 5, 7, 31-37 & Exs. E, F, H, I.

10. To calculate these proceeds, Lam relied on publicly-available data, such as the public bitcoin blockchain, and on documents Commission counsel provided his firm, Integra, regarding Grant's self-reported activity with BitConnect and with various crypto trading platforms where Grant maintained accounts. *See* Lam Decl. ¶¶ 31-33 & Ex. E at 2 (listing the sources of Lam's analysis of Grant's crypto asset activity).[3]

11. Lam then applied the "common-input-ownership heuristic," or "co-spend" heuristic, and other established methods to trace Grant's net proceeds. Lam Decl. ¶¶ 8-23.

12. Lam concluded that Grant received a total of 484.18 bitcoin (then worth $3,271,587) from BitConnect between April 14, 2017 and January 19, 2018 and that, after

---

[2] Grant claimed that he received only $300,000 in referral commissions and $600,000 in development fund commissions from BitConnect, for a total of $900,000 in commissions. Primoff Decl. Ex. 1 at 133:12-25, 283:1-6. Grant provided no documentation to support these round figures.

[3] Lam noted that the sources used for Grant were Excel files that were too voluminous to be attached (either partially or in their entirety) to his declaration. Lam Decl. ¶ 32, and notes 17 and 21; Lam Decl. Ex. E at 2, 43-88, 89. At the Court's request, the Commission will submit the ledger in electronic form.

accounting for Grant's deposits of 228.46 bitcoin ($1,523,440) into BitConnect, Grant's net proceeds from BitConnect were 255.72 bitcoin, worth $1,748,147 as of the dates he received them. Lam Decl. ¶¶ 7, 31-37 & Exs. F, H, I.[4]

## II. BITCONNECT INVESTORS SUSTAINED SUBSTANTIAL LOSSES.

13. BitConnect, through Grant and others, raised approximately $2 billion from investors. ¶ 1; *see also* Lam Decl. ¶ 5.

14. On January 4, 2018, the Texas State Securities Board issued a cease-and-desist order against BitConnect, ¶ 217, and on January 9, 2018, the North Carolina Secretary of State Securities Division followed suit, ¶ 219.

15. On January 16, 2018, BitConnect announced that it was closing the Lending Program and the "BitConnect Exchange," the purported crypto asset trading platform that supposedly supported it, immediately. ¶¶ 39, 222.

16. That day, the price of BCC lost 92% of its value, ¶ 223, as reflected by the price history the Commission staff obtained from CoinmarketCap.com, *see* Sept. Primoff Decl., Ex. 1.

17. During the following week in January 2018, many investors seeking to withdraw their funds were unable to access the BitConnect website that had their account login. ¶¶ 36, 39-40, 224-225.

---

[4] This net-proceeds figure of $1,748,147 does not include a deduction for advertising expenses Grant may have incurred to drive investor interest in BitConnect's unlawful offering, including approximately $193,324 in advertising expenses that certain documentation the Commission staff received during its investigation arguably shows. *See* Sept. 16, 2024 Decl. of Richard G. Primoff, Dkt. No. 88 ("Sept. Primoff Decl.") ¶ 87.

18. Once investors were able to access their BitConnect accounts, they found they could do nothing with the BCC tokens they believed they owned based on BitConnect's representations, and investors lost all or nearly all of their funds invested in the Lending Program. ¶ 225.

19. In addition, in the related criminal case brought by the Department of Justice ("DOJ"), *United States v. Arcaro*, 21 Cr. 2542 (S.D. Cal.) (the "Arcaro Criminal Case"), defendant Glenn Arcaro ("Arcaro")—BitConnect's "national promoter" in the United States overseeing Grant and other regional promoters, ¶¶ 25, 66, 104—entered into a plea agreement on September 1, 2021, in which he acknowledged that he had conspired with BitConnect's founder and others to defraud BitConnect's investors and potential investors. Arcaro Criminal Case, Dkt. No. 6 at ¶ 7.[5]

20. Arcaro further acknowledged that BitConnect had operated a "global crypto asset Ponzi scheme that defrauded retail investors of over $2 billion through investments in BitConnect's 'Lending Program'" by making false representations about BitConnect's proprietary technology that would purportedly generate "substantial profits and 'guaranteed returns' to investors' money to trade on the volatility of cryptocurrency markets." *Id*. at ¶¶ 1-4.

21. Arcaro also acknowledged that, when the BitConnect scheme collapsed in January 2018, the price of BitConnect's crypto asset (BCC) plummeted, and investors were unable to withdraw their investments. *Id*. at ¶¶ 66-70.

22. In seeking restitution and forfeiture in the Arcaro Criminal Case, the DOJ noted

---

[5] Arcaro was identified as BitConnect's "United States National Promoter" in the Complaint (¶ 25), and was named in the related proceeding *SEC v. BitConnect*, 21 Civ. 7349 (JGK), Dkt. No. 1 at ¶ 21.

that it had received more than 5,300 submissions from potential BitConnect victims, of whom 797 had provided sufficient documentation to include in its proposed restitution order, for a total restitution amount of more than $17 million as to Arcaro alone. Arcaro Criminal Case, Dkt. No. 59 at 4, 6.

23. On February 13, 2023, the court in the Arcaro Criminal Case ordered this amount to be paid from more than $38 million the DOJ had obtained from liquidating crypto assets that Arcaro had paid into the court. Arcaro Criminal Case, Dkt. No. 74.

24. If the Court orders Grant to pay $1,748,147 in disgorgement and the Commission collects that amount, a distribution to harmed investors is feasible. *See* Sept. Primoff Decl. ¶ 137.

### III. THE FEDERAL TAX UNDERPAYMENT RATE ON $1,748,147 IS $702,105.84 THROUGH AUGUST 31, 2024, MUCH LESS THAN BITCOIN'S GROWTH IN PRICE DURING THE SAME PERIOD.

25. Applying the Internal Revenue Service ("IRS") tax underpayment rate to the figure of $1,748,147, amounts to $702,105.84 (for purposes of prejudgment interest) from January 2018 through August 31, 2024, the last full month before the Commission filed its motion for default judgment against Grant. *See* Sept. Primoff Decl. Ex. 3.

26. The closing price of bitcoin increased at least threefold from January 16, 2018, to August 26, 2024. *See* Lam Decl. Ex. B.

## PROPOSED CONCLUSIONS OF LAW

### I. GRANT SHOULD PAY $1,748,147 IN DISGORGEMENT.

#### A. The Legal Standards Governing Disgorgement

1. Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Securities Exchange Act of 1934 ("Exchange Act") authorize courts to order disgorgement in Commission enforcement actions. *See* 15 U.S.C. §§ 78u(d)(3), 78u(d)(5) & 78u(d)(7).

2. The "primary purpose of disgorgement as a remedy for violation of the securities

laws is to deprive violators of their ill-gotten gains." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *SEC v. China Energy Sav. Tech.*, No. 06 Civ. 6402 (ADS), 2008 WL 6572372, at *10 (E.D.N.Y. Mar. 28, 2008) (quoting *First Jersey*, 101 F.3d at 1474); *see also Liu v. SEC*, 591 U.S. 71, 79 (2020) ("Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity.").

3. "[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)." *Liu*, 591 U.S. at 75.

4. Disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Ahmed*, 72 F.4th 379, 397 (2d Cir. 2023) (cleaned up).

5. Once the Commission establishes this reasonable approximation, the burden shifts to the defendant to prove a more reasonable figure. *See SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996). "Where disgorgement calculations cannot be exact, any risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* (cleaned up).

6. To award disgorgement, a district court at the remedial phase of a Commission action must first find that investors suffered pecuniary harm. *See SEC v. Govil*, 86 F.4th 89, 98 (2d Cir. 2023). However, "disgorgement is 'measured by' the wrongful gain obtained by the defendant rather than by the loss to the investor." *Id*. at 105.

   **B.   The Commission Has Established the Predicate of Investor Pecuniary Harm.**

7. The predicate of pecuniary harm required under *Govil* for purposes of ordering disgorgement has been established here based on the Complaint's factual allegations, which must be taken as true for purposes of this motion. Indeed, in *SEC v. iFresh*, the court granted the Commission's motion for disgorgement following a bifurcated judgment that also required the

7

court to accept the complaint's allegations as true. No. 22 Civ. 3200, 2024 WL 416709, at *3-5 (E.D.N.Y. Feb. 5, 2024). The court found that the complaint's factual allegation that the price of the stock at issue had been artificially inflated during the period of defendants' fraud sufficed to establish that investors who had purchased during that period suffered pecuniary harm. *Id.* at *3.

8. The Complaint's allegations suffice to establish that investors suffered pecuniary harm. The Complaint alleges that BitConnect, through Grant and others, raised approximately $2 billion from investors worldwide (a figure confirmed by the Commission's expert, Lam Decl. ¶ 5), in unregistered securities offerings and that investors lost almost all of those funds. ¶¶ 1, 217-225; Proposed Findings of Facts ("FOF"), *supra*, ¶¶ 13-18.

9. Furthermore, the ill-gotten gains Grant received constituted investor losses, because his "referral fee" and "development fund" commissions came indirectly from investors. ¶¶ 5-6.

10. In addition, the restitution order in the Arcaro Criminal Case, *see* FOF ¶¶ 19-23, confirms that BitConnect investors suffered pecuniary harm. *See SEC v. Oppenheimer*, No. 15 Civ. 5456, 2024 WL 3342098, at *4 n.2 (S.D.N.Y. July 8, 2024) (accepting SEC's argument that a criminal order of restitution against individuals other than defendants, who were engaged in same misconduct, satisfied *Govil*'s predicate of pecuniary harm).

C. **Grant's Net Proceeds from His Unlawful Conduct Total $1,748,147.**

11. The "common-input-ownership heuristic," or "co-spend" heuristic, that Lam used to trace the total amount of bitcoin Grant received from BitConnect from April 2017 to January 2018 has received "widespread academic approval." *United States v. Sterlingov*, No. 21 Cr. 399 (RDM), 2024 WL 860983, at *13-15 (D.D.C. Feb. 29, 2024) (rejecting *Daubert* challenge to government expert's use of co-spend blockchain heuristic, or "common-input-ownership

8

heuristic," to conduct bitcoin tracing).

12.    $1,748,147—the value of the net amount of bitcoin Lam calculated Grant received between April 14, 2017 and January 19, 2018 as proceeds from BitConnect, *see* FOF ¶¶ 9-12—is at least a reasonable approximation of Grant's net proceeds from his unlawful sales of BitConnect Lending Program securities.

13.    Grant received this amount in commissions from his unregistered sales of these securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act"), ¶¶ 226-231, while Grant himself was also not registered as a broker-dealer in violation of Exchange Act Section 15(a), ¶¶ 232-237. *See, e.g.*, *SEC v. Coinseed*, No. 21 Civ. 01381, 2023 WL 5016491, at *3-4 (S.D.N.Y. Jan. 30, 2023) (Netburn, Mag. J.), *adopted by* 2023 WL 5334613 (S.D.N.Y. July 12, 2023) (Gardephe, J.) (on default judgment motion, finding disgorgement from a company and its founder of proceeds raised from unregistered offering of crypto assets as securities was appropriate, as proceeds were causally connected to Section 5 violation); *SEC v. Keener*, 644 F. Supp. 3d 1290, 1305 (S.D. Fla. 2022) (noting that the majority of defendant's investors experienced stock price declines and were thus "victims of his unlawful dealing" and ordering defendant to disgorge profits received from transactions he engaged in without registering as a dealer in violation of Section 15(a)); *SEC v. Fierro*, No. 20 Civ. 02104, 2024 WL 2292054, at *6 (D.N.J. May 21, 2024) (ordering disgorgement of defendant's profits from transacting securities without registering as a dealer in violation of Exchange Act Section 15(a)).

14.    Grant is not entitled to a deduction from this amount for any purported social media advertising expenses.

15.    Even assuming Grant paid any such expenses in connection with BitConnect, they are not "legitimate expenses," but were instead "incurred for the purposes of furthering" his

9

unregistered offers and sales of BitConnect securities while acting as an unregistered broker. *Liu*, 591 U.S. at 91-92 (in remanding to the district court to recalculate disgorgement after deducting "legitimate expenses," noting that some expenses the district court declined to deduct "went toward lease payments and cancer-treatment equipment" which "arguably have value independent of fueling" securities law violations); *see also SEC v. Liu*, No. SACV 16-00974-CJC(AGRx), 2021 WL 2374248, at *7 (C.D. Cal. June 7, 2021) (concluding on remand that a payment was "not a legitimate business expense, but rather another overt act of [defendant]'s fraud" because the purpose was for defendant "to get away with his fraud and make more money"), *aff'd*, 2022 WL 3645063 (9th Cir. Aug. 24, 2022); *CFTC v. Tayeh*, 848 F. App'x 827, 829 (11th Cir. 2021) ("[D]efendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts."). Thus any advertising expenses should not be deducted from Grant's commissions to calculate his net profits for disgorgement purposes.

16. Disgorgement of $1,748,147 is also consistent with *Liu*'s holding that disgorgement awarded under Exchange Act Section 21(d)(5)'s equitable relief provision be "awarded for victims," *Liu*, 591 U.S. at 75, because, if the Commission can collect this amount from Grant, a distribution to investors harmed by the unlawful BitConnect offering is feasible. *See* FOF ¶ 24.

17. For these reasons, Grant must disgorge $1,748,147.

## II. GRANT SHOULD PAY $702,105.84 IN PREJUDGMENT INTEREST.

18. Requiring the payment of prejudgment interest "prevents a defendant from obtaining the benefit of 'what amounts to an interest free loan procured as a result of illegal activity.'" *SEC v. Rinfret*, No. 19 Civ. 6037 (AJN), 2020 WL 6559411, at *6 (S.D.N.Y. Nov. 9, 2020).

19. Courts routinely grant the Commission prejudgment interest on disgorgement

amounts. *See SEC v. Ahmed*, No. 15 Civ. 675, 2021 WL 2471526, at *6 (D. Conn. June 16, 2021) (collecting cases).

20. Typically, to calculate prejudgment interest, courts apply the IRS tax underpayment rate to the disgorgement amount. *See*, *e.g.*, *Ahmed*, 72 F.4th at 403-04 (affirming award of prejudgment interest to the Commission based on applying IRS underpayment rate to defendant's disgorgement amount).

21. Grant must pay $702,105.84 in prejudgment interest, the amount calculated by applying the IRS underpayment rate to Grant's ill-gotten gains of $1,748,147 from January 16, 2018, the date BitConnect announced it was closing the Lending Program, through August 31, 2024, the last full month before the Commission filed its motion for default judgment. *See* Sept. Primoff Decl. Ex. 3, Dkt. No. 88-3.

22. This sum is far less than the increase in value since January 2018 of the bitcoin Grant received from BitConnect. Lam Decl. Ex. B.

### III. GRANT SHOULD PAY A CIVIL PENALTY OF $230,480.

23. The Securities Act and Exchange Act authorize courts to impose civil penalties for violations of the securities laws. *See* 15 U.S.C. §§ 77t(d)(2)(A)-(C) & 78u(d)(3)(B)(i)-(iii).

24. Civil penalties serve the dual purpose of penalizing defendants for past violations and deterring them from future misconduct. *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 280 (E.D.N.Y. 2011), *aff'd in relevant part and vacated in part on other grounds*, 738 F.3d 14 (2d Cir. 2013). "[B]ecause disgorgement represents merely a return of ill-gotten gains," courts recognize that "an additional monetary penalty is necessary to appropriately punish and deter…fraudulent activities." *SEC v. Forest Res. Mgmt. Corp.*, No. 09 Civ. 0903 (JSR), 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010).

25. The securities laws provide for three tiers of penalties to be "determined by the

11

court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3).

26.  "District courts have discretion in determining the appropriate amount of any penalty" imposed under the federal securities laws. *SEC v. Lybrand*, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003), *aff'd, SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).

27.  Under each tier, district courts are authorized to impose a penalty that is the greater of the defendant's gross "pecuniary gain" from the violation or the applicable tiered amount for each violation. The penalty tiers applicable from November 3, 2015, to the present—encompassing the relevant period—are as follows, for individual (not corporate) defendants:

*First tier*:   $11,524 for an individual per violation;

*Second tier*:   $115,231 for an individual per violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; or

*Third tier*:   $230,464 for an individual per violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."

15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B); 89 Fed. Reg. 1970, 1971 (Jan. 11, 2024).

28.  Factors that courts consider in determining whether penalties should be imposed and the amount of the penalty include: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *Forest Res. Mgmt.*, 2010 WL 2077202, at *2; *SEC v. Opulentica, LLC*, 479 F. Supp.

2d 319, 331 (S.D.N.Y. 2007); *see also SEC v. Kane*, No. 97 Civ. 2931 (CBM), 2003 WL 1741293, at *4 (S.D.N.Y. Apr. 1, 2003) ("If the defendant is indeed impecunious, the SEC will ultimately not be able to collect on the judgment . . . . While the court may take the defendant's current financial difficulties into account, these circumstances alone cannot negate the need for a severe civil penalty."). In addition, courts have considered whether a defendant has cooperated with authorities in assessing the amount of a civil penalty. *See, e.g.*, *SEC v. LEK Sec. Corp.*, 612 F. Supp. 3d 287, 295 (S.D.N.Y. 2020).

29. Courts also consider a defendant's lack of contrition in determining civil penalties. *See SEC v. Tourre*, 4 F. Supp.3d 579, 596 (S.D.N.Y. 2014).

30. These factors warrant a significant penalty, as described below.

31. First, while the Complaint does not allege that Grant committed fraud or acted with scienter, the Complaint does allege that his conduct was egregious and recurrent, as Grant was engaged in violations of Securities Act Section 5 and Exchange Act Section 15(a) for ten months from April 2017 to January 2018. ¶¶ 89, 112-113, 117; FOF ¶¶ 1-12; Lam Decl. Ex. F at 1, 5 (detailing Grant's receipt of bitcoin from BitConnect from April 2017 to January 2018).

32. Next, the Commission has established that Grant's conduct created substantial losses for investors, as investors—including those recruited directly by Grant or by others he recruited—lost almost all of the $2 billion they invested in BitConnect. ¶¶ 1, 101, 102, 217-225; *see* FOF ¶¶ 13-23.

33. Finally, Grant has neither expressed any remorse or responsibility for his unlawful conduct, nor cooperated with authorities; on the contrary, he has not appeared in this action at all. *See* Order at 1 ("Defendant Craig Grant ('Grant') has failed to respond to the Order to Show Cause and therefore the [Commission] is entitled to a default judgment against Grant.").

13

34. Courts have counted violations for purposes of calculating penalties by various methods. *E.g.*, *SEC v. Colonial Inv. Mgmt. LLC*, 381 F. App'x 27, 32 (2d Cir. 2010) (affirming penalty of $ 25,000 for each of the defendant's eighteen violative transactions); *SEC v. Lazare Indus., Inc.*, 294 F. App'x 711, 715 (3d Cir. 2008) (statute permits penalty equal to the maximum amount multiplied by the 54 illegal sales of stock); *cf. Otis & Co. v. SEC*, 106 F.2d 579, 584 (6th Cir. 1939); *Reserve Fund Secs. & Deriv. Litig.*, No. 09 Civ. 4346, 2013 WL 5432334, at *20 (Sept. 30, 2013) (noting that violations can be calculated based on the number of statutes violated, the number of transactions or misstatements, and/or the number of investors to whom the illegal conduct was directed); *LEK Sec.*, 612 F. Supp.3d at 298-299 ("A penalty measured in terms of months is a reasonable intermediate metric that fulfills the need to impose significant fines while honoring the value of proportionality.").

35. Under these circumstances, a civil penalty of $230,480, calculated by assessing two first-tier penalties of $11,524 for each of the two statutes Grant violated—for a total of $230,480—multiplied by the ten months he violated the securities laws is reasonable and appropriate. *See LEK Sec.*, *supra*.

36. In any event, a penalty of $230,480 for Grant is much less than either the gross amount of his pecuniary gain ($3,271,587, FOF ¶ 12), or even his net proceeds of $1,748,147, and far less than any penalty assessed based on the approximately 4,000 investors Grant induced to invest in the Lending Program, which would yield a penalty figure of more than $300 million.

37. For these reasons, Grant must pay a civil penalty of $230,480.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court enter a default judgment against Grant, in the proposed form previously filed, *see* Dkt. No. 92, that, in

addition to the injunctive relief set forth therein, orders Grant to pay: (1) $1,748,147 in disgorgement; (2) $702,105.84 in prejudgment interest; and (3) $230,480 in civil penalties.

Dated:	December 2, 2024
	New York, New York

                              Respectfully submitted,

                              s/Richard G. Primoff
                              By:	Richard G. Primoff
                                    Gwen A. Licardo
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              100 Pearl Street
                              New York, NY 10004
                              Tel: (212) 336-0148 (Primoff)