UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————

SECURITIES AND EXCHANGE
COMMISSION,

                           Plaintiff,

          - against -

TREVON BROWN, ET AL.,

                           Defendants.

———————————————

21-cv-4791 (JGK)

<u>Memorandum
Opinion and Order</u>

**John G. Koeltl, District Judge:**

The plaintiff, the United States Securities and Exchange Commission (the "SEC"), brought this action against defendants Trevon Brown ("Brown"), Craig Grant ("Grant"), Ryan Maasen ("Maasen"), and Michael Noble ("Noble") for violations of Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c) (the "Securities Act"), and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a) (the "Exchange Act"). Compl. ¶¶ 226–231, 232–237, ECF No. 1.

On August 12, 2021, the Court entered a bifurcated consent judgment against Noble (the "Partial Judgment"), leaving the determination of monetary relief to the Court, upon the SEC's motion. J. Def. Noble ("Part. Judg."), ECF No. 32. The SEC then filed this motion for monetary relief against Noble. ECF No. 93. For the reasons that follow, the SEC's motion is **granted.**

## I.

From June 2017 through January 2018, Noble promoted, offered, and sold securities in the form of investments in a "lending program" offered by

BitConnect, an unincorporated organization established in approximately 2016. Compl. ¶¶ 23, 165–89. BitConnect's founder created a native digital token, called the "BitConnect Coin" ("BCC"), and claimed that BCC was an "open source, peer-to-peer, community driven decentralized cryptocurrency."[1] Id. ¶¶ 36–37. In January 2017, BitConnect launched a "digital asset trading platform" on the BitConnect Website and stated that users could buy, sell, and trade BCC for Bitcoin (and vice versa) on the website by transacting directly with other BCC holders. Id. ¶¶ 39–40. Beginning in January 2017, BitConnect offered investors the opportunity to participate in the company's "lending program," in which investors could tender Bitcoin to Bitconnect in return for daily "interest" payments. Id. ¶ 41.

In June 2017, Noble began promoting BitConnect by posting promotional YouTube videos online in which he advertised the purported merits of BitConnect. Id. ¶¶ 168, 172–75. On his YouTube channel, Noble included his BitConnect referral link and repeatedly urged his viewers to invest in the lending program. Id. ¶¶ 170, 172. Noble also created social media advertisements directing people to his videos promoting the lending program. Id. ¶ 185. Noble earned "referral commissions" for those in his downline. Id. ¶ 177. In August or September 2017, Noble became a "regional promoter," entitling him to earn additional commissions in the form of "development funds." Id. ¶ 178.

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

Through his promotions, Noble obtained approximately 1,000 investors in his downline, many of whom used his referral links to invest in the BitConnect lending program. Id. ¶ 186. Noble obtained approximately $731,281 from BitConnect referral commissions and development funds. Id. ¶ 187. During this time, Noble was not associated with any broker-dealer firm or registered with the SEC himself as a broker-dealer. Id. ¶ 189. BitConnect raised approximately $2 billion by conducting the unregistered offering and sale of securities in the form of investments. Id. ¶ 1. On January 16, 2018, BitConnect announced that it was closing the lending program and investors lost most, if not all, of their invested funds. See id. ¶¶ 222–25. The SEC alleges that Noble's conduct violated Section 5 of the Securities Act, id. ¶¶ 226–31, and Section 15(a) of the Exchange Act, id. ¶¶ 232–37.

On August 12, 2021, with Noble's consent, the Court entered the Partial Judgment, which resolved Noble's liability and enjoined Noble from violating Section 5 of the Securities Act and Section 15(a) of the Exchange Act. Part. Judg. §§ I-II. Pursuant to the Partial Judgment, Noble is precluded from arguing that he did not violate the relevant federal securities laws and from challenging the validity of the Partial Judgment. Id. § V. The Partial Judgment left the amount of any disgorgement of ill-gotten gains, prejudgment interest, and civil penalties to be determined by the Court upon the SEC's motion. Id. § V.

On December 15, 2021, the Court granted motions by the Department of Justice (the "DOJ") to stay this case pending the resolution of a related

criminal investigation. ECF No. 56. In this case, on July 19, 2024, the Court modified the stay at the SEC's request and without objection from Noble. ECF No. 77. The modification limited the stay to discovery proceedings and set a deadline for 30 days for the SEC to provide a further status letter to the Court. Id.

On September 16, 2024, the SEC filed this motion for monetary relief in the form of disgorgement, prejudgment interest, and a civil penalty against Noble pursuant to the Partial Judgment, ECF No. 93. The SEC asked that the Court order disgorgement in the amount of $731,281, prejudgment interest in the amount of $293,703.36, and a civil penalty of $50,000. SEC Mem. L. Supp. Mot. Monetary Relief ("SEC Memo") 2, ECF No. 94. On October 21, 2024, Noble wrote a letter responding to the SEC's motion. Noble Letter Opp. SEC Memo ("Noble Ltr."), ECF No. 106. Noble contested many of the SEC's findings, ultimately arguing that the SEC's suggested amounts to be paid for disgorgement, prejudgment interest, and a civil penalty are too high. See id. at 3–9.

## II.

The SEC requests that the Court order disgorgement, prejudgment interest, and a civil penalty. The Court addresses each request in turn.

### A.

Once a court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering

defendants to disgorge their profits. See SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996). In SEC civil enforcement actions, disgorgement serves to "deprive violators of their ill-gotten gains." Id. Disgorgement awards issued as equitable relief must not exceed a wrongdoer's net profits derived from his or her securities-law violations. See Liu v. SEC, 591 U.S. 71, 74–75 (2020). "[Disgorgement] consists of factfinding by a district court to determine the amount of money acquired through wrongdoing . . . and an order compelling the wrongdoer to pay that amount plus interest to the court." SEC v. Cavanaugh, 445 F.3d 105, 116 (2d Cir. 2006). The Court has broad discretion in calculating the amount defendants should pay in disgorgement and is not required to establish the disgorgement amount with certainty. First Jersey, 101 F.3d at 1474–75. Rather, the amount of disgorgement ordered need only be a "reasonable approximation of profits causally connected to the violation." SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013). "[S]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.[2]

---

[2] Although the Court of Appeals for the Second Circuit previously suggested that disgorgement requires proof of pecuniary harm to investors, see SEC v. Govil, 86 F.4th 89, 98 (2d Cir. 2023), the Supreme Court has since rejected that argument. In Sripetch v. SEC, the Court held that "a showing of pecuniary loss is not required" before the SEC may obtain disgorgement under the federal securities law. 146 S. Ct. 1403, 1410 (2026). Accordingly, the SEC need only establish that the amount sought for disgorgement corresponds to Noble's net profits derived from the wrongdoing.

To determine the amount of money acquired through wrongdoing for purposes of calculating disgorgement, courts apply a two-part burden shifting framework. See FTC v. Bronson Partners, LLC, 654 F.3d 359, 368 (2d Cir. 2011); see also SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996). First, the SEC must show that "its calculations reasonably approximated the amount of the defendant's unjust gains." Bronson Partners, 654 F.3d at 368. Once the SEC has met its burden of establishing a reasonable approximation of profits causally related to the violations, the burden shifts to the defendant to demonstrate that the disgorgement figure is inaccurate. Id. "In making the disgorgement calculation, the proper focus is revenues, not profits." SEC v. Fowler, 440 F. Supp. 3d 284, 296 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 225 (2d Cir. 2021).

In this case, the SEC alleges both that investors suffered pecuniary harm and that Noble received ill-gotten gains. The Complaint alleges that BitConnect, through Noble and others, raised approximately $2 billion from investors worldwide, and that investors lost almost all of those funds. Compl. ¶¶ 1, 222–25. Noble's ill-gotten gains, in the forms of "referral fees" and "development fund" commissions, came indirectly from investors. See id. ¶¶ 5–6. The Complaint alleges that Noble received a total of $731,281 based on the amount of the investments he induced into the unlawfully unregistered BitConnect offerings. See id. ¶¶ 5–7, 60–67, 75–77, 177–79, 186–87. The SEC's expert witness, David Lam ("Lam"), used various methodologies to confirm that this figure is a reasonable approximation of Noble's gains by

calculating that Noble actually received more than $767,000 from BitConnect. SEC Memo 18. The SEC accordingly requests disgorgement in the amount of $731,281 because this amount represents the proceeds of Noble's unregistered offering and sale of BitConnect securities. See id. at 2.

In opposing the SEC's motion, Noble criticizes Lam's findings that Noble received more from BitConnect ($767,921) than the $731,281 the SEC seeks for disgorgement. See Noble Ltr. §§ III, IX, X. Noble argues that there are critical gaps and inaccuracies in Lam's analysis, id. § IX, and that Lam's findings of how much money Noble received from BitConnect are both speculative and unreliable, id. § X. While he criticizes Lam's findings, Noble provides no evidence, affidavits, expert analysis, or other competent proof to substantiate his arguments. Therefore, Noble has failed to carry his burden to demonstrate that the SEC's disgorgement figure is not reasonable or that certain gains were not causally connected to the violation. See First Jersey, 101 F.3d at 1475; see also SEC v. O'Brien, 674 F. Supp. 3d 85, 101 (S.D.N.Y. 2023), aff'd, No. 23-1071, 2024 WL 2813722 (2d Cir. June 3, 2024).

Noble also contends that the disgorgement order will render him unable to live and care for his family. Noble Ltr. § IV. However, Noble has not provided any financial records or evidence of his financial condition to make the argument that the amount calculated for disgorgement is excessive. In any event, "financial hardship is not grounds for denying disgorgement." SEC v. McCaskey, No. 98-cv-6153, 2002 WL 850001, at *5 (S.D.N.Y. Mar. 26, 2002). Noble also claims that he has been fully compliant with his tax

obligations, and that the disgorgement order will render him unable to meet future tax obligations. Noble Ltr. § IV. However, while the Supreme Court's decision in Liu mandates that courts deduct legitimate expenses before ordering disgorgement, see Liu, 591 U.S. at 91–92, personal income taxes are not deductible as legitimate expenses, see O'Brien, 674 F. Supp. 3d, at 101 n.9.

Noble also claims that a significant portion of the funds sought for disgorgement were lost when the BitConnect platform shut down and thus should not be included in the disgorgement order. Noble Ltr. § III. This claim of lost funds, however, does not preclude the SEC from seeking disgorgement of the full amount of ill-gotten gains, because dissipation of funds does not shield a wrongdoer from disgorgement liability. See McCaskey, 2002 WL 850001, at *5; SEC v. Thomas James Assocs., Inc., 738 F. Supp. 88, 95 (W.D.N.Y. 1990) ("Nor may a securities law violator avoid or diminish his responsibility to return his ill-gotten gains by establishing that he is no longer in possession of such funds.").

Noble also argues that the disgorgement figure is inappropriate because the funds in question are unavailable to be returned to victims. Noble Ltr. § VIII. Noble does not submit any evidence in support of this argument, but, in any event, it is unpersuasive. "[T]he primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006). Given that compensation of victims is a "secondary goal" of disgorgement, the unavailability of funds for direct

restitution does not preclude the SEC from seeking disgorgement of a certain amount. See id. Courts retain broad discretion to ensure that wrongdoers are stripped of their ill-gotten gains, even if those funds cannot be returned directly to victims. See SEC v. Fischbach Corp., 133 F.3d 170, 175–76 (2d Cir. 1997); see also Sripetch, 146 S. Ct. at 1410.

* * *

The SEC has sufficiently demonstrated that disgorgement in the amount of $731,281 represents a reasonable approximation of Noble's ill-gotten gains. The SEC has adequately provided evidence through the various research methods of their expert witness to substantiate the amount of disgorgement that they request. See SEC Memo 18. Noble has failed to carry his burden of proving that this figure is inaccurate or that any reduction is warranted. Accordingly, the Court orders disgorgement in the amount of $731,281.

**B.**

Because the primary purpose of disgorgement as a remedy for violations of the securities laws is to deprive violators of their ill-gotten gains, courts have discretion to "award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits." Razmilovic, 738 F.3d at 36. The award of prejudgment interest, like disgorgement, deprives the wrongdoer of his or her ill-gotten gains and prevents unjust enrichment. See SEC v. Drexel Burnham Lambert Inc., 837 F.

9

Supp. 587, 611–12 (S.D.N.Y. 1993). In deciding whether to award prejudgment interest, courts consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) . . . fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO, 955 F.2d 831, 833–34 (2d Cir. 1992). Requiring the payment of prejudgment interest "prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." SEC v. Rinfret, No. 19-cv-6037, 2020 WL 6559411, at *6 (S.D.N.Y. Nov. 9, 2020).

To calculate prejudgment interest, courts typically apply the Internal Revenue Service ("IRS") tax underpayment rate to the disgorgement amount. See First Jersey, 101 F.3d at 1476. This rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud." Id. In the Partial Judgment, the Court ordered, with Noble's consent, that prejudgment interest shall be calculated from January 16, 2018, based on the rate of interest used by the IRS for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). Part. Judg. § V. The SEC applied the underpayment rate to Noble's ill-gotten gains of $731,281 from January 16, 2018, through August 31, 2024, resulting in a prejudgment interest amount of $293,703.36. SEC Memo 21; Decl. Primoff Ex. 2, ECF No. 95-2.

10

Noble contends that the SEC's calculation of prejudgment interest is excessively harsh because he lost a substantial amount of his ill-gotten gains. Noble Ltr. § X.H. Noble's argument is unpersuasive. Noble has not provided any evidence of his financial condition to make the argument that the amount calculated is excessive. Moreover, financial hardship is not an exceptional circumstance that justifies denying an award of prejudgment interest or reducing the amount of such interest. See SEC v. Wyly, 56 F. Supp. 3d 394, 432–33 (S.D.N.Y. 2014). In Wyly, the court awarded prejudgment interest despite the defendants' arguments that they had dissipated the ill-gotten gains and faced financial difficulties, reasoning that the defendants had benefited from the use of the unlawful profits during the fraud and the dissipation of those gains did not absolve them of the obligation to pay prejudgment interest. Id. Disgorgement, which includes the award of prejudgment interest, would not be an effective remedy or deterrent of securities violations if "defendants could avoid it by spending their unlawful gains before the government discovers the fraud." Id. at 433.

Noble further asserts that the SEC's request for $293,703.36 in prejudgment interest is excessive because of the Court's stay of this proceeding. Noble Ltr. § X.H. Noble's objection rests on the premise that the stay in this case unfairly delayed the proceedings and thereby increased prejudgment interest. See id. Courts in the Second Circuit have consistently held that prejudgment interest in securities violations actions continues to accrue during litigation or court-ordered stays, even when the Government requested

the stay. See, e.g., First Jersey, 101 F.3d at 1477 (affirming the award of pre-judgment interest for the entire period despite defendant's arguments that the litigation was protracted due to delays attributable to the SEC); SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998) (rejecting the defendant's argument that the SEC's nine-year delay in bringing the action should reduce the pre-judgment interest); Wyly, 56 F. Supp. 3d at 433 (awarding prejudgment interest for a period as long as twenty-two years while recognizing that the SEC was partially responsible for the delay).

In any event, Noble agreed, in consenting to the Partial Judgment, that if disgorgement were awarded, prejudgment interest would accrue from January 16, 2018, based on the rate of interest used by the IRS for the underpayment of income tax, SEC Ltr. ¶ 3, ECF 28-3, and he did not oppose the Government's request for a stay on the ground that prejudgment interest would continue to accrue. Instead, Noble "had the use of [his] unlawful profits for the entire period." First Jersey, 101 F.3d at 1477. The SEC's proposed pre-judgment interest calculation comports with the Partial Judgment, and Noble has not shown that the interest rate applied was punitive, that the calculation was erroneous, or that any extraordinary circumstances warrant departure from the standard of calculating prejudgment interest. Accordingly, the Court orders Noble to pay $293,703.36 in prejudgment interest.

C.

The Securities Act and Exchange Act authorize courts to impose civil penalties for violations of the securities laws. 15 U.S.C. § 77t(d)(2); 15 U.S.C. §78u-1(d)(3)(B). Courts may impose civil penalties not more than "(i) the gross pecuniary gain to a defendant as a result of the violation, or (ii) a specified amount per violation, depending on whether the violation falls in the first-tier, second-tier, or third-tier." SEC v. Shah, No. 22-cv-3012, 2022 WL 17979812, at *6 (S.D.N.Y. Dec. 28, 2022); 15 U.S.C. § 77t(d)(2); 15 U.S.C. 78u-1(d)(3)(B). "A first-tier penalty may be imposed for any violation of the Exchange Act or the Securities Act." Shah, 2022 WL 17979812, at *6. "A second-tier penalty may be imposed if the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." Id. "[A] third-tier penalty may be imposed when, in addition to meeting the requirements of a second-tier penalty, the violation directly or indirectly resulted in substantial losses or created significant risk of substantial losses to other persons." Id.

The actual amount of the penalty is left to the discretion of the court, guided by the facts and circumstances of each case. See Rinfret, 2020 WL 6559411, at *6. Civil penalties serve to both punish violators and deter future violations of securities laws. See SEC v. Rosenfeld, No. 97-cv-1467, 2001 WL 118612, at *4 (S.D.N.Y. Jan. 9, 2001). In determining to impose civil penalties and their amounts, courts consider factors such as:

> (1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the

13

defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation.

SEC v. Genovese, 553 F. Supp. 3d 24, 46 (S.D.N.Y. 2021) (quoting SEC v. Zwick, No. 03-cv-2742, 2007 WL 831812, at *26 (S.D.N.Y. Mar. 16, 2007), aff'd, 317 F. App'x 34 (2d Cir. 2008)).

The SEC seeks a first-tier penalty of $50,000 from Noble. SEC Memo 23. The SEC bases this calculation on the allegations that Noble was engaged in ongoing violations of Securities Act Section 5 and Exchange Act Section 15(a), received approximately $731,281 in ill-gotten gains, and aided in investor loss of almost $2 billion. Id. While this penalty is less than the gross amount of Noble's gains from his violations ($731,281), the SEC considers Noble's partial cooperation with the SEC in consenting to the entry of injunctive relief, the fact that Noble's ill-gotten gains were significantly less than the gains of others involved, and the shorter duration of his unlawful conduct to constitute factors warranting a decrease in the amount to be paid. Id.

Noble contends that the SEC's requested amount of $50,000 in civil penalties is excessively harsh. Noble Ltr. § X.H. Noble argues that he did not act with intent to deceive, and that his cooperation with the SEC and current financial condition warrants a reduction in the amount of civil penalty requested. Id. §§ II, X.H. These arguments are unconvincing. The SEC considered Noble's lack of scienter and the absence of any fraud allegations when requesting the most minimal, first-tier penalty of $50,000. SEC Memo

14

23. Similarly, the SEC considered Noble's partial cooperation in consenting to the entry of injunctive relief when requesting the minimal penalty. Id.

In arguing for a reduced civil penalty, "[t]he defendant bears the burden of establishing that his financial circumstances warrant a reduction in penalties." SEC v. Penn, No. 14-cv-581, 2018 WL 4378444, at *6 (S.D.N.Y. Sep. 14, 2018). In this case, Noble has not met his burden of demonstrating that his financial condition warrants a reduction in the civil penalty requested by the SEC. While Noble claims he has a "negative net worth," lost fifty bitcoins, and "gave away" another eleven, Noble Ltr. §§ II, X.H, Noble provides no evidence, sworn declaration, sufficient documentation, or other competent proof to substantiate these claims, see, e.g., SEC v. Rabinovich & Assocs., LP, No. 07-cv-10547, 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (noting the defendant's failure to provide an accounting in concluding that the civil penalty should not be mitigated by his financial hardship).

The first-tier penalty of $50,000 that the SEC seeks in the absence of any fraud allegations against Noble is appropriate. While Noble may not have acted with scienter, thus warranting a more minimal civil penalty compared to his counterparts, Noble's conduct was nonetheless both egregious and recurrent. Noble repeatedly, over the span of eight months, violated Securities Act Section 5 and Exchange Act Section 15(a) by inducing investors to participate in BitConnect's lending program while acting as an unregistered securities broker and selling securities in an unregistered offering. As a result of this misconduct, Noble received approximately $731,281 in ill-gotten

gains and ultimately contributed to investor losses totaling nearly the entire $2 billion invested in BitConnect. In light of these facts and considering both Noble's lack of scienter and his cooperation with the SEC, the $50,000 civil penalty sought by the SEC is both appropriate and proportionate under the circumstances. Accordingly, the Court orders Noble to pay a $50,000 civil penalty.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the SEC's motion for monetary relief against Noble is **granted**. Noble is ordered to pay disgorgement in the amount of $731,281, prejudgment interest in the amount of $293,703.36, and a civil penalty in the amount of $50,000. The Clerk is respectfully requested to enter judgment against Noble consistent with this Order.

The Clerk is also requested to close ECF No. 93.

**SO ORDERED.**

Dated:  New York, New York
        July 15, 2026

_____
John G. Koeltl
United States District Judge

16