UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

TREVON BROWN, ET AL.,

Defendants.

**21-cv-4791 (JGK)**

**Memorandum Opinion and Order**

**John G. Koeltl, District Judge:**

The plaintiff, the United States Securities and Exchange Commission (the "SEC"), brought this action against the defendants, Trevon Brown, Craig Grant ("Grant"), Ryan Maasen, and Michael Noble for violations of Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c) (the "Securities Act"), and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a) (the "Exchange Act"). See Compl. ¶¶ 226–37, ECF No. 1.

After Grant failed to respond to the SEC's complaint, the Court issued an Order to Show Cause as to why a default judgment should not be entered against Grant. ECF No. 100. Grant did not respond, and thus, the SEC is entitled to a default judgment against Grant. ECF No. 114. At the Court's direction, the SEC submitted proposed findings of fact and conclusions of law with respect to damages and other monetary relief. See ECF Nos. 114, 127. Grant did not file any response to the SEC's proposed findings.

For the reasons that follow, the SEC's motion for monetary relief against Grant is **granted**, and the Court will adopt the SEC's proposed

judgment as to Grant. The defendant is ordered to pay **$1,748,747** in disgorgement, **$702,105.84** in prejudgment interest, and a civil penalty of **$230,480**.

## I.[1]

### A.

From approximately January 2017 through January 16, 2018, BitConnect, an unincorporated organization, offered investors the opportunity to participate in its "lending program." Compl. ¶ 1. BitConnect told investors they would earn daily interest payments by tendering bitcoin to BitConnect in exchange for BitConnect's digital tokens called the BitConnect Coin ("BCC"), which investors would then lend to BitConnect in return for such interest payments (the "Lending Program"). Id. ¶¶ 3, 36; see id. ¶¶ 41–59. These investments in the Lending Program were offered and sold as securities. Id. ¶ 1. No registration statement was ever filed with the SEC in connection with offers or sales of the Lending Program investments. Id. ¶¶ 1–2. No exemption from the requirements of the securities laws ever applied to these offers and sales. Id. ¶ 1; see also id. ¶¶ 26–30. To promote its unregistered securities offering, BitConnect paid promoters referral commissions and development fund commissions based on the number of new investments the

[1] Because the defendant defaulted, factual allegations in the complaint relating to liability are accepted as true. SEC v. Coinseed, Inc., No. 21-cv-1381, 2023 WL 5016491, at *3 (S.D.N.Y. Jan. 30, 2023), report and recommendation adopted, No. 21-cv-1381, 2023 WL 4348357 (S.D.N.Y. July 5, 2023). Factual allegations in the complaint concerning damages are not accepted as true. Id.

promoters succeeded in obtaining for BitConnect through their promotions. Id. ¶¶ 60–68, 75–76.

Grant was a regional BitConnect promoter. Id. ¶¶ 18, 104. From approximately April 2017 to January 2018, he received referral and development fund commissions from BitConnect, based on the BitConnect investments he raised. Id. ¶¶ 6, 103–06. He promoted BitConnect's unregistered securities offering by posting videos on YouTube and social media advertisements. Id. ¶¶ 4, 89–111. Grant has never been associated with any broker-dealer firm or registered with the SEC as a broker-dealer. Id. ¶ 116. Yet Grant raised many millions of dollars for BitConnect through his promotional activities and directly recruited or indirectly recruited[2] more than 4,000 investors for BitConnect. Id. ¶¶ 101, 102, 112. Grant did not receive a fixed salary, hourly wage, or other compensation from BitConnect that was not tied to the amount of funds he raised from investors for BitConnect securities. Id. ¶ 114. In investigative testimony he provided to the SEC prior to the complaint's filing, Grant admitted that he received referral commissions and development fund commissions based on the dollar value of funds he raised from investors for BitConnect. See July 9, 2019 Craig Grant Investigative Testimony Tr. at 120:14–121:2, 123:18–124:19, 130:16–131:25, Primoff Decl. Ex. 1, ECF No. 126-1.

---

[2] Investors recruited by investors whom Grant had recruited, and then further recruited by those "downline" investors. Compl. ¶¶ 62–64.

BitConnect, through Grant and others, raised approximately $2 billion from investors. Compl. ¶ 1; see also Sept. 4, 2024 David Lam Decl. ("Lam Decl.") ¶ 5, ECF No. 89. On January 4, 2018, the Texas State Securities Board issued a cease-and-desist order against BitConnect, Compl. ¶ 217, and on January 9, 2018, the North Carolina Secretary of State Securities Division followed suit, id. ¶ 219. On January 16, 2018, BitConnect announced that it was closing the Lending Program and the BitConnect Exchange, the purported crypto asset trading platform that supposedly supported it, immediately. Id. ¶¶ 39, 222. That day, the price of BCC lost 92% of its value, id. ¶ 223, as reflected by the price history the SEC staff obtained from CoinmarketCap.com, see Sept. 16, 2024 Primoff Decl. ("Sept. Primoff Decl.") Ex. 1, ECF No. 88-1. In the week following BitConnect's announcement, many investors seeking to withdraw their funds were unable to access the BitConnect website. Compl. ¶¶ 224–25. Once investors were able to access their BitConnect accounts, they found they could do nothing with the BCC tokens that, based on BitConnect's representations, the investors believed they owned. Id. ¶ 225. Investors lost all or nearly all of their funds invested in the Lending Program. Id.

**B.**

The SEC's expert, David Lam, calculated the precise amount of net proceeds Grant received from BitConnect from April 2017 through January 2018. See Lam Decl. ¶¶ 1, 4, 5, 7, 31–37 & Exs. E, F, H, I. Lam relied on

publicly available data, such as the public bitcoin blockchain, and on documents SEC counsel provided his firm, Integra, regarding Grant's self-reported activity with BitConnect and with various crypto trading platforms where Grant maintained accounts. See Lam Decl. ¶¶ 31–33 & Ex. E at 2 (listing the sources of Lam's analysis of Grant's crypto asset activity). Lam then applied the "common-input-ownership heuristic," or "co-spend" heuristic, and other established methods to trace Grant's net proceeds. See Lam Decl. ¶¶ 8–23. Lam concluded that Grant received a total of 484.18 bitcoin (then worth $3,271,587) from BitConnect between April 14, 2017, and January 19, 2018, and that, after accounting for Grant's deposits of 228.46 bitcoin ($1,523,440) into BitConnect, Grant's net proceeds from BitConnect were 255.72 bitcoin, worth $1,748,147 as of the dates he received them. Lam Decl. ¶¶ 7, 31–37 & Exs. F, H, I. The Government is capable of distributing these funds to harmed investors. See Sept. Primoff Decl. ¶ 137.

Applying the Internal Revenue Service ("IRS") tax underpayment rate to the figure of $1,748,147, amounts to $702,105.84 (for purposes of prejudgment interest) from January 2018 through August 31, 2024, the last full month before the SEC filed its motion for default judgment against Grant. See Sept. Primoff Decl. Ex. 3, ECF No. 88-3. The closing price of bitcoin increased at least threefold from January 16, 2018, to August 26, 2024. See Lam Decl. Ex. B, ECF No. 89-2.

## II.

### A.

Based on Lam's calculations, the SEC seeks $1,748,747 in disgorgement. Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act authorize courts to order disgorgement in SEC enforcement actions. See 15 U.S.C. §§ 78u(d)(3), 78u(d)(5) & 78u(d)(7). The "primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains." SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996); SEC v. China Energy Sav. Tech., Inc., No. 06-cv-6402, 2008 WL 6572372, at *10 (E.D.N.Y. Mar. 28, 2008); see also Liu v. SEC, 591 U.S. 71, 79 (2020) ("Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity."). "[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)." Liu, 591 U.S. at 75. Disgorgement "need only be a reasonable approximation of profits causally connected to the violation." SEC v. Ahmed, 72 F.4th 379, 397 (2d Cir. 2023).

Once the SEC establishes this reasonable approximation, the burden shifts to the defendant to prove a more reasonable figure. See SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996) (per curiam). "Where disgorgement calculations cannot be exact, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.[3]

---

[3] Although the Court of Appeals for the Second Circuit previously suggested that disgorgement requires proof of pecuniary harm to investors, see SEC v. Govil, 86 F.4th 89, 98 (2d Cir. 2023), the Supreme Court has since rejected

The Court accepts Lam's calculation methods. The "common-input-ownership heuristic," or "co-spend" heuristic, which Lam used to trace the total amount of bitcoin Grant received from BitConnect from April 2017 to January 2018, has received "widespread academic approval." United States v. Sterlingov, 719 F. Supp. 3d 65, 82–84 (D.D.C. 2024) (rejecting Daubert challenge to government expert's use of co-spend blockchain heuristic, or "common-input-ownership heuristic," to conduct bitcoin tracing).

Lam's calculation approximates reasonably Grant's net proceeds from his unlawful sales of BitConnect Lending Program securities between April 14, 2017, and January 19, 2018. Grant received this amount in commissions from his unregistered sales of these securities in violation of Section 5 of the Securities Act, Compl. ¶¶ 226–31, while Grant himself was also not registered as a broker-dealer in violation of Exchange Act Section 15(a), id. ¶¶ 232–37. See, e.g., Coinseed, 2023 WL 5016491, at *3–4 (on default judgment motion, finding disgorgement from a company and its founder of proceeds raised from unregistered offering of crypto assets as securities was appropriate, as proceeds were causally connected to Section 5 violation); SEC v. Keener, 644 F. Supp. 3d 1290, 1305–07 (S.D. Fla. 2022) (noting that the majority of defendant's investors experienced stock price declines and were

---

that argument. In Sripetch v. SEC, the Court held that "a showing of pecuniary loss is not required" before the SEC may obtain disgorgement under the federal securities law. 146 S. Ct. 1403, 1410 (2026). Accordingly, the SEC need only establish that the amount sought for disgorgement corresponds to Grant's net profits derived from the wrongdoing.

thus "victims of his unlawful dealing" and ordering defendant to disgorge profits received from transactions he engaged in without registering as a dealer in violation of Section 15(a)); SEC v. Fierro, No. 20-cv-02104, 2024 WL 2292054, at *6–7 (D.N.J. May 21, 2024) (ordering disgorgement of defendant's profits from transacting securities without registering as a dealer in violation of Exchange Act Section 15(a)).

Grant is not entitled to a deduction from this amount for any purported social media advertising expenses. Even assuming Grant paid any such expenses in connection with BitConnect, they are not "legitimate expenses," but were instead "incurred for the purposes of furthering" his unregistered offers and sales of BitConnect securities while acting as an unregistered broker. Liu, 591 U.S. at 91–92 (in remanding to the district court to recalculate disgorgement after deducting "legitimate expenses," noting that some expenses the district court declined to deduct "went toward lease payments and cancer-treatment equipment" which "arguably have value independent of fueling" securities law violations); see also SEC v. Liu, No. SACV-16-00974, 2021 WL 2374248, at *7–8 (C.D. Cal. June 7, 2021) (concluding on remand that a payment was "not a legitimate business expense, but rather another overt act of [defendant]'s fraud" because the purpose was for defendant "to get away with his fraud and make more money"), aff'd, No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022); CFTC v. Tayeh, 848 F. App'x 827, 829 (11th Cir. 2021) ("[D]efendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts."). Thus any advertising expenses

are not deducted from Grant's commissions to calculate his net profits for disgorgement purposes.

Disgorgement of $1,748,147 is also consistent with Liu's holding that disgorgement awarded under Exchange Act Section 21(d)(5)'s equitable relief provision be "awarded for victims," Liu, 591 U.S. at 75, because, if the SEC can collect this amount from Grant, a distribution to investors harmed by the unlawful BitConnect offering is feasible. See Sept. Primoff Decl. ¶ 137.

Because the SEC satisfied its burden to provide a reasonable approximation, the burden shifts to Grant to prove a more reasonable figure. However, Grant did not file any response to the SEC's complaint or proposed findings. Therefore, the Court accepts the SEC's figure.

* * *

For the reasons stated above, the defendant is ordered to pay disgorgement in the amount of **$1,748,747**.

**B.**

The SEC also seeks $702,105.84 in prejudgment interest. Requiring the payment of prejudgment interest "prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." SEC v. Rinfret, No. 19-cv-6037, 2020 WL 6559411, at *6 (S.D.N.Y. Nov. 9, 2020). Courts routinely grant the SEC prejudgment interest on disgorgement amounts. See SEC v. Ahmed, No. 15-cv-675, 2021 WL 2471526, at *6 (D. Conn. June 16, 2021) (collecting cases), aff'd in part, vacated in part,

remanded, 72 F.4th 379 (2d Cir. 2023). Typically, to calculate prejudgment interest, courts apply the IRS tax underpayment rate to the disgorgement amount. See, e.g., Ahmed, 72 F.4th at 403–04 (affirming award of prejudgment interest to the SEC based on applying IRS underpayment rate to defendant's disgorgement amount). Grant must pay $702,105.84 in prejudgment interest, the amount calculated by applying the IRS underpayment rate to Grant's ill-gotten gains of $1,748,147 from January 16, 2018, the date BitConnect announced it was closing the Lending Program, through August 31, 2024, the last full month before the SEC filed its motion for default judgment. See Sept. Primoff Decl. Ex. 3. This sum is far less than the increase in value since January 2018 of the bitcoin Grant received from BitConnect. Lam Decl. Ex. B.

Accordingly, the defendant is ordered to pay **$702,105.84** in prejudgment interest.

**C.**

Finally, the SEC seeks a civil penalty of $230,480. The Securities Act and Exchange Act authorize courts to impose civil penalties for violations of the securities laws. See 15 U.S.C. §§ 77t(d)(2)(A)–(C) & 78u(d)(3)(B)(i)–(iii). Civil penalties serve the dual purpose of penalizing defendants for past violations and deterring them from future misconduct. SEC v. Razmilovic, 822 F. Supp. 2d 234, 280 (E.D.N.Y. 2011), aff'd in relevant part and vacated in part on other grounds, 738 F.3d 14 (2d Cir. 2013). "[B]ecause disgorgement

represents merely a return of ill-gotten gains," courts recognize that "an additional monetary penalty is necessary to appropriately punish and deter . . . fraudulent activities." SEC v. Forest Res. Mgmt. Corp., No. 09-cv-0903, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010).

The securities laws provide for three tiers of penalties to be "determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3). "District courts have discretion in determining the appropriate amount of any penalty" imposed under the federal securities laws. SEC v. Lybrand, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003), aff'd sub nom., SEC v. Kern, 425 F.3d 143 (2d Cir. 2005). Under each tier, district courts are authorized to impose a penalty that is the greater of the defendant's gross "pecuniary gain" from the violation or the applicable tiered amount for each violation. The penalty tiers applicable from November 3, 2015, to the present—encompassing the relevant period—are as follows, for individual (not corporate) defendants. First tier: $11,524 for an individual per violation; Second tier: $115,231 for an individual per violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; Third tier: $230,464 for an individual per violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B); 89 Fed. Reg. 1970, 1971 (Jan. 11, 2024). Factors that courts consider in determining whether penalties should

be imposed and the amount of the penalty include: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." Forest Res. Mgmt., 2010 WL 2077202, at *2; SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007); see also SEC v. Kane, No. 97-cv-2931, 2003 WL 1741293, at *4 (S.D.N.Y. Apr. 1, 2003) ("If the defendant is indeed impecunious, the SEC will ultimately not be able to collect on the judgment . . . . While the court may take the defendant's current financial difficulties into account, these circumstances alone cannot negate the need for a severe civil penalty."). In addition, courts have considered whether a defendant has cooperated with authorities in assessing the amount of a civil penalty. See, e.g., SEC v. LEK Sec. Corp., 612 F. Supp. 3d 287, 295–96 (S.D.N.Y. 2020). Courts also consider a defendant's lack of contrition in determining civil penalties. See SEC v. Tourre, 4 F. Supp. 3d 579, 596 (S.D.N.Y. 2014).

The factors in this case warrant a significant penalty. First, while the Complaint does not allege that Grant committed fraud or acted with scienter, the Complaint does allege that his conduct was egregious and recurrent, because Grant was engaged in violations of Securities Act Section 5 and Exchange Act Section 15(a) for ten months from April 2017 to January 2018. See Compl. ¶¶ 89, 112–13, 117; Lam Decl. Ex. F at 1, 5 (detailing Grant's

receipt of bitcoin from BitConnect from April 2017 to January 2018). Next, the SEC established that Grant's conduct created substantial losses for investors, because investors—including those recruited directly by Grant or by others he recruited—lost almost all of the $2 billion they invested in BitConnect. Compl. ¶¶ 1, 101–02, 217–25. Finally, Grant has neither expressed any remorse or responsibility for his unlawful conduct, nor cooperated with authorities; he has not appeared in this action at all. See ECF No. 114, at 1.

Courts have counted violations for purposes of calculating penalties by various methods. E.g., SEC v. Colonial Inv. Mgmt. LLC, 381 F. App'x 27, 32 (2d Cir. 2010) (affirming penalty of $25,000 for each of the defendant's eighteen violative transactions); SEC v. Lazare Indus., Inc., 294 F. App'x 711, 715 (3d Cir. 2008) (statute permits penalty equal to the maximum amount multiplied by the 54 illegal sales of stock); In re Rsrv. Fund Secs. & Deriv. Litig., No. 09-cv-4346, 2013 WL 5432334, at *20 (S.D.N.Y. Sept. 30, 2013) (noting that violations can be calculated based on the number of statutes violated, the number of transactions or misstatements, and/or the number of investors to whom the illegal conduct was directed); LEK Sec., 612 F. Supp. 3d at 299 ("A penalty measured in terms of months is a reasonable intermediate metric that fulfills the need to impose significant fines while honoring the value of proportionality."). Under these circumstances, a civil penalty of $230,480, calculated by assessing two first-tier penalties of $11,524 for each of the two statutes Grant violated, multiplied by the ten months he violated the securities laws, is reasonable and appropriate. See id.

In any event, a penalty of $230,480 for Grant is much less than either the gross amount of his pecuniary gain ($3,271,587), or even his net proceeds of $1,748,147, and far less than any penalty assessed based on the approximately 4,000 investors Grant induced to invest in the Lending Program, which would yield a penalty figure of more than $300 million.

For these reasons, Grant must pay a civil penalty of **$230,480**.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the SEC's motion for monetary relief is **granted**. Grant is ordered to pay disgorgement in the amount of **$1,748,747**, prejudgment interest in the amount of **$702,105.84**, and a civil penalty in the amount of **$230,480**.

The Court will enter the proposed default judgment. The Court certifies that judgment should be entered promptly pursuant to Federal Rule of Civil Procedure 54(b) because there is no just reason to delay entry of final judgment as to defendant Grant.

**SO ORDERED.**

**Dated: New York, New York**
**August 7, 2026**

**John G. Koeltl**
**United States District Judge**